WESTERN UNION TELEGRAPH CO. v. McMILLAN.   (No. 8103.)

(Court of Civil Appeals of Texas. Ft. Worth. Feb. 13, 1915. Rehearing Denied March 13, 1915.)

1. TELEGRAPHS AND TELEPHONES ☞66—DELAY IN DELIVERY OF MESSAGES—EVIDENCE—SUFFICIENCY.

Evidence held to justify a finding of negligent delay in the delivery of a telegram.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. §§ 61–63; Dec. Dig. ☞66.]

2. TELEGRAPHS AND TELEPHONES ☞54—DELIVERY OF MESSAGES — STIPULATIONS — ACTIONS.

The filing of an action is the presentation of a claim, within a stipulation for the transmission of a telegram that the telegraph company will not be liable for any damages where the claim is not presented within a specified time after accrual of cause of action.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. §§ 39–47; Dec. Dig. ☞54.]

3. TELEGRAPHS AND TELEPHONES ☞54—DELIVERY OF MESSAGES — STIPULATIONS — ACTIONS.

Where the sendee of a message, dated December 25th, announcing the fatal illness of his granddaughter, was, by fraudulent representations of the telegraph company, led to believe that the message was sent December 26th, too late to enable him to attend the funeral, and he did not discover the facts until January 19th following, the company was estopped from taking advantage of the misrepresentations, and the period stipulated for in the contract for notice of any claim of damages did not begin to run until January 19th.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. §§ 39–47; Dec. Dig. ☞54.]

4. TELEGRAPHS AND TELEPHONES ☞37—DELIVERY OF MESSAGES — RELATIONSHIP OF PARTIES.

A telegraph company must take notice of the relationship of an addressee to a person whose illness or death is announced in a telegram, and of such mental anguish as it may reasonably be expected the addressee may suffer from a failure to attend the relative during his illness, or his burial in the event of his death.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. §§ 23, 24, 29, 30, 32; Dec. Dig. ☞37.]

5. TELEGRAPHS AND TELEPHONES ☞68—DELIVERY OF MESSAGES — RELATIONSHIP OF PARTIES.

The relation of grandfather and grandchild is not so remote as to prevent recovery by the grandfather for mental anguish from inability to attend the grandchild's funeral, because of negligent delay in delivering a telegram to him.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. §§ 69, 70; Dec. Dig. ☞68.]

6. TELEGRAPHS AND TELEPHONES ☞65—DELAY IN DELIVERY OF MESSAGES—ACTIONS—ISSUES, PROOF, AND VARIANCE.

The variance between the petition in an action against a telegraph company for delay in delivering a message announcing the fatal illness of a grandchild of the sendee, alleging that the sendee owned a horse and buggy, which he would have used to make the trip to attend the funeral of the grandchild, and proof that a horse and buggy was owned by a nephew, but that he would have procured the same to make the trip, was not substantial.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. §§ 54–60; Dec. Dig. ☞65.]

Appeal from District Court, Comanche County; J. H. Arnold, Judge.

Action by A. McMillan against the Western Union Telegraph Company. From a judgment for plaintiff, defendant appeals. Affirmed.

Arch Grinnan, of Brownwood, and N. L. Lindsley, of Dallas, for appellant. Goodson & Goodson, of Comanche, for appellee.

DUNKLIN, J. On December 25, 1913, A. McMillan resided in Comanche, Tex., and at the same time his daughter, Mrs. I. N. Alderman, resided with her husband and family in the country a few miles from San Saba. On that date Mrs. Alderman's little girl, 9 or 10 years of age, died at her home. Just before her death T. W. Alderman, brother-in-law of Mrs. Alderman, went to San Saba from the home of the sick child and sent to the grandfather, A. McMillan, the following message over the Western Union Telegraph Company's line:

"San Saba, Texas, Dec. 25, 1913.
"To A. McMillan, Comanche, Texas:
"I. N. Alderman's little girl is not expected to live. Come at once.
"[Signed]              T. W. Alderman."

That message was promptly transmitted, and was received by the agent of the sending company at Comanche at 11:48 a. m. on December 25, 1913, the same day it was sent, but was not delivered to the addressee until the morning of December 29, 1913. The child mentioned in the telegram died on December 25th, and was buried on the afternoon of December 26th, near the place where her parents resided. The first information of her illness, death, and burial was received by A. McMillan by letter, which reached him on December 29th, shortly before he received the telegram. He instituted this suit against the telegraph company for damages resulting from mental anguish, which he alleges he suffered by reason of his failure to attend the burial of his grandchild. The claim for damages was predicated upon alleged negligence on the part of the defendant in failing to deliver the message to the plaintiff on December 25th. Plaintiff alleged that, had he received the telegram on the afternoon of December 25th, he would have started immediately from Comanche for the home of his daughter by private conveyance, and would

have reached his destination in time to have attended the funeral. The trial was before the court without a jury, and the trial judge did not file findings of fact and conclusions of law. Judgment was rendered in favor of the plaintiff, and the defendant has appealed.

It is shown by uncontroverted evidence that, December 25th being a legal holiday, the defendant's office hours at Comanche on that date were from 8 to 10 o'clock a. m. and from 4 to 6 o'clock p. m.; that when the message came over the defendant's wire to the office at 11:48 a. m., the agent was not then on duty, but happened to be in the office at the time and received the message; that the agent immediately began to make inquiries of the whereabouts of the addressee. The addressee was a farmer by occupation, and had resided in Comanche about five months only, and during that period of time had resided in three different locations. He testified that on December 25th he resided about 600 yards from the defendant's office, and this estimate of the distance does not seem to have been controverted. He further testified that, if the telegram had been delivered to him at any time up to 8 or 9 o'clock p. m. on December 25th, he could and would have gone to his daughter's house that night. He further testified as follows:

"I would have gone in a buggy, and would have started just as soon as I could have fixed up and started. I did not have a horse and buggy, but my nephew had one, and I would have got it and went with them. It is a fact that I would have gotten a conveyance and gone to my daughter's house, had I gotten the telegram."

He further testified that he had made the same trip by private conveyance before, knew the distance to be about 55 miles, and knew that he could have made the trip in about 8 hours.

[1] By its first assignment appellant contends that it was shown by undisputed evidence that its agent, J. M. Boren, who received the message at Comanche, exercised ordinary diligence to find A. McMillan, and hence no liability on the part of the defendant was established. According to the testimony of that agent, which was corroborated by several witnesses he did make numerous inquiries to ascertain the whereabouts of the addressee, but without success. The inquiries extended over the afternoon of December 25th into the following day, and were made of numerous citizens, including the postmaster, who were well acquainted with the people generally in the town of Comanche, and who had never heard of A. McMillan; that being informed by Kemp, one of the persons of whom he inquired, that a man by the name of McMillan lived across the creek south of town, the agent rented a bicycle and took the message out there, but was informed by people in that locality that the McMillan who had lived there was not the addressee, and that he had moved away.

To controvert the testimony of the agent relative to the diligence exercised by him to find the addressee, plaintiff introduced as a witness Judge J. H. McMillan, a resident attorney in Comanche and a cousin to the plaintiff. He testified that the plaintiff was well known to him, that he also knew the house in which plaintiff lived on December 25th; knew when plaintiff moved in there, and the location of the house from which he moved just prior to that time; that about 5 o'clock on the evening of December 25, 1913, he received a telephone call from a party, who stated at the time, "This is the Western Union talking," and who inquired if witness knew A. McMillan, stating at the time that he had a telegram for him. To that inquiry witness replied by telling the inquirer just where plaintiff lived, and at the same time giving specific directions how to find the house, if he did not know its location already. Plaintiff also introduced Jim Rowe, another witness, who testified that he was in business in Comanche on December 25, 1913, occupying at the time the east side of the same building, the west side of which was occupied by the defendant company. According to his testimony, a wooden lattice was the only obstruction between his place of business and the Western Union Telegraph office. He further testified that on the date in controversy he remembered that Mr. Boren told him of receiving a message for A. McMillan, and inquired if witness knew him. To that inquiry witness answered in the negative, but suggested to Boren to telephone to Judge J. H. McMillan, as the addressee might be related to him. He further testified as follows:

"I understood that Mr. Boren phoned Judge McMillan. Some one phoned from there, and they were talking as if they were talking to Judge McMillan. Whoever was talking was talking from the telegraph office over there. I think the phoning was done immediately after I made the suggestion. It may have been a few minutes, but it was all right in the same building. I would not say whether it was Boren talking to Judge McMillan or not. * * * I think whoever it was that was talking to the Judge asked him if he knew A. McMillan, or knew anything about him. It is my recollection that this happened Christmas Day, but I am not sure about that. * * * I understood whoever was going to do the phoning was going to ask Judge McMillan about this man, and it is my recollection that whoever did the phoning said that Judge McMillan said he did not know anything about the party. It was my understanding that he said this right straight after he did the talking. It looked to me like everybody, including the agent, was making every effort they could to find this man. * * * I do not remember who else was in the office about that time, but there was people in and around there all the time. * * * Otis Guthrie was there a good deal of the time, but I would not say whether he was there then or not. He was there a good deal of the time in the office. I would not say whether he was there at the time the conversation took place or not."

In rebuttal of that testimony the agent, Boren, testified that Mr. Rowe suggested to him that he telephone Judge McMillan and inquire if he knew the addressee; that Guthrie was in the office at the time, trying to locate him; that the witness then went immediately to the telephone office for the purpose of pursuing his search for the addressee, leaving Guthrie in the defendant's office at the time; that Guthrie was not working for the company at all at that time, and had not so worked for a year; that Guthrie made several inquiries to see if he could locate A. McMillan; that after witness returned from the telephone office Guthrie told witness that he had called up Judge McMillan over the phone, but was unable to find out where A. McMillan lived; that witness did not call Judge McMillan at all, and knew nothing about the conversation occurring over the phone which was detailed by Judge McMillan. The man Guthrie referred to did not testify in the case.

The plaintiff introduced other testimony to show that the telegram as written out by the agent and delivered to the addressee was dated December 26th, instead of December 25th, and later, when questioned about this, Boren made statements to the effect that the original message was not filed at San Saba until 5:35 p. m. on December 25th, and was not received at the Comanche office until 8:10 a. m. December 26th; that it was not sent from the San Saba office on December 25th, because that was a holiday; that he mailed to the addressee a notice of the receipt of the message about 10:30 a. m. on December 26th, and that he did not phone to any one on the 25th of December, because he did not receive the message until December 26th. The plaintiff testified he received no notice through the post office from the defendant company that the telegram had been received.

In view of the testimony above set out, we are unable to agree with appellant's contention that due diligence by it to deliver the message was shown by uncontroverted evidence. The testimony of Judge McMillan, in connection with the circumstances detailed by the witness Rowe, and the further testimony of contradictory statements by the agent, which tended to discredit his testimony generally, was sufficient, we believe, to sustain a finding by the court that the agent received the information relative to the residence of the addressee given by Judge McMillan over the telephone, that he received that information on the afternoon of December 25th, and that he was guilty of negligence in not delivering the message to the addressee upon the afternoon of that date.

[2, 3] On the back of the telegram was the following stipulation:

"That the defendant will not be liable for any damages or statutory penalties in any case where the claim is not presented in writing within 95 days after the cause of action, if any, shall have arisen."

The defendant pleaded this stipulation as part of the contract, and by another assignment of error insists that as the undisputed

evidence shows that plaintiff did not present any claim for damages within the period of time named in the stipulation, nor at any other time, that the court erred in rendering any judgment against it. The suit was instituted April 7, 1914, more than 95 days after the cause of action arose, and the suit was the only claim of damages ever presented by the plaintiff, if the filing of the suit can be said to constitute a presentation of the claim.

By supplemental petition the plaintiff alleged that through fraudulent misrepresentations made by the defendant's agent he was misled to believe that the original telegram was dated December 26th, instead of December 25th, and that he did not discover that the representation was untrue until about January 19, 1914. According to testimony of the plaintiff and his attorney, Judge Goodson, plaintiff purposed a suit for damages against the defendant soon after the receipt of the message, but was advised that he had no cause of action, since he had received information by letter to the effect that the child was buried on December 26th, and that plaintiff could not possibly have attended the burial, however speedily the message may have been delivered, if it was not sent from the San Saba office until December 26th, and that by reason of the statements made to him and to his attorney, and referred to above, in addition to the further fact that the telegram, as the same was delivered to the plaintiff, purported to have been sent from San Saba on December 26th, he was induced to believe, and did believe, that he had no cause of action, and did not discover the falsity of such information until on January 19, 1914. Less than 95 days intervened between that date and the date of the filing of the suit. It is well settled that the filing of a suit is the presentation of a claim within the meaning of the stipulation shown on the back of the telegram, and the evidence referred to was sufficient to sustain a finding by the trial judge that the defendant was estopped from taking advantage of the misrepresentations referred to, and that the 95-day period for notifying the defendant of plaintiff's claim of damages did not begin to run until January 19, 1914. See Phillips v. Western Union Telegraph Co., 95 Tex. 638, 69 S. W. 63; Western Union Telegraph Co. v. Timmons, 136 S. W. 1169.

[4, 5] It is also well settled that a telegraph company must take notice of relationship of the addressee to a person whose illness or death is announced in the telegram, and of such mental anguish which it may reasonably be expected the addressee may suffer from a failure to attend such relative during his illness, or to attend his burial in the event he dies, and we are of opinion further that the relation of grandfather and grandchild is not too remote to sustain a recovery for such damages. S. W. Telegraph & Telephone Co. v. Andrews, 169 S. W. 218, and authorities there cited; Western Union Telegraph Co. v. Blake (Ark.) 169 S. W. 240; Western Union Telegraph Co. v. Porterfield, 84 S. W. 850.

[6] By another assignment it is insisted that the undisputed evidence shows that plaintiff was not in position to go to the bedside of his grandchild, and he could not have gone in time to be present at the burial. The proposition submitted under this assignment is not germane thereto, in that it is to the effect that there was a fatal variance between the pleading and proof, in that it was alleged in the petition plaintiff owned a horse and buggy which he would have used to make the trip, while the proof shows that he would have used other means, to wit, a horse and buggy owned by his nephew which he would have procured. Even if the proposition be considered, we are of the opinion that it presents no substantial variance.

For the reasons indicated, the judgment is affirmed.